# EXHIBIT B

# GAS SALES AND PURCHASE

# CONTRACT

### between

## National Iranian Oil Company

## (N.I.O.C.)

### and

## Crescent Petroleum Company
## International Ltd.

## (CRESCENT)

TABLE OF CONTENTS

1    DEFINITIONS...................................................................................................4

2    OBJECT OF CONTRACT AND SALES AND PURCHASE OBLIGATIONS...................8

3    QUALITY OF GAS AND DELIVERY PRESSURE.............................................12

4    DELIVERY POINT............................................................................................14

5    COMMENCEMENT OF DELIVERY.................................................................16

6    MEASUREMENT AND TESTING CENTRE.......................................................17

7    GAS CONTROL AND COMMUNICATION.......................................................18

8    GAS TRANSMISSION SYSTEM.......................................................................19

9    DAILY AND MONTHLY REPORT....................................................................20

10   CONTRACT PRICE FOR GAS..........................................................................22

11   INVOICING AND PAYMENT...........................................................................25

12   TERM OF CONTRACT.....................................................................................28

13   FORCE MAJEURE............................................................................................29

14   LANGUAGE....................................................................................................31

15   CONFIDENTIALITY.........................................................................................32

16   ASSIGNMENT.................................................................................................33

17   MEETINGS.....................................................................................................34

18   TAXES AND CHARGES....................................................................................35

19   AMENDMENTS...............................................................................................36

20   INEFFECTIVE PROVISIONS, HEADINGS AND EXCHANGE OF INFORMATION...........37

21   NOTICES........................................................................................................38

22   GOVERNING LAWS AND ARBITRATION.......................................................39

23   WARRANTY....................................................................................................40

24   ANNUAL AND MONTHLY PURCHASE PROGRAMMING.................................41

25   MUTUAL INDEMNITY.....................................................................................42

26   TERMINATION...............................................................................................43

Annex 1
Annex 2

2

*In The Name of God*

# GAS SALES AND PURCHASE CONTRACT

This Contract is made this 25th day of April 2001, between:

National Iranian Oil Company (NIOC), a company incorporated and existing under the laws of the Islamic Republic of Iran, whose Head Office is situated at Taleghani Avenue, Tehran, I.R. of Iran (hereinafter referred to as " Seller"), of the one part

and

Crescent Petroleum Company International Limited (Crescent), a corporation incorporated and existing under the laws of Bermuda, whose Head Office is situated at Crescent Tower, Al Buhaira Corniche, Sharjah, United Arab Emirates, (hereinafter referred to as "**Buyer**"), of the other part.

And hereinafter NIOC and Crescent will be referred to collectively as "**Parties**", and individually as "**Party**".

WHEREAS:

- Seller agrees and undertakes to sell and Buyer agrees and undertakes to buy certain quantities of Gas at the price, terms and conditions as specified hereunder;

- Seller and Buyer by virtue of their respective statutes are authorized to execute the present Contract for the sales and purchase of Gas;

- Seller and Buyer intend to execute the provisions of this Contract in good faith.

Now, therefore, the Parties hereby agree as follows:

**A r t i c l e (1)**

## 1    Definitions

1.1   Except where the context requires otherwise, the terms used in this Contract are defined as follows:

**"Agreed Repairs and Maintenance"** shall have the meaning as defined in the Operation Agreement.

**"Annual Contract Quantities"** or **"ACQ"** shall have the meaning as defined in Article 2.4.

**"Average Crude Oil Price"** shall have the meaning as defined in Article 10.4.

**"Average Weighted GHV"** shall be the arithmetic sum of the total Btu in a Delivery Month divided by the arithmetic sum of the total quantity in scf of the Gas delivered during the same Delivery Month.

**"British Thermal Unit"** or **"Btu"** shall be the quantity of heat equal to 1055.056 joules (International Table), and **"MMBtu"** shall mean one million Btu.

**"Buyer's Bank"** shall have the meaning as defined in Article 11.3.

**"Carry-Forward Quantities"** shall have the meaning as defined in Article 2.6.

**"Celsius (centigrade) Degree"** or **"deg C"** or **"$^{0}$C"** shall be the particular interval between any temperature in Kelvin and the temperature of 273.15 (two seven three decimal one five) Kelvin, as defined in International Standard ISO 1000 (SI Units and Recommendation for the use of their multiples and of certain other units).

**"Commencement Date"** shall have the meaning as defined in Article 5.

**"Contract Price "** shall have the meaning as defined in Article 10.

**"Daily Contract Quantity"** or **"DCQ"** shall have the meaning as defined in Article 2.3.

**"Daily Report"** shall have the meaning as defined in Article 9.2 and as more particularly described in the Operation Agreement.

**"Day"** shall mean 24 hours period beginning at 00:00 hours and ending at the following 00:00 hours Official Local Time at the Measurement and Testing Centre, for the purposes of reference under this Contract, the date of a Day (as defined above) shall be the Gregorian calendar date upon which the Day begins and **"Daily"** shall be construed accordingly.

"**Deficient Quality Gas**" shall have the meaning as defined in Article 3.5.

"**Delivery Month**" shall mean each period of one Month during a Delivery Year.

"**Delivery Point**" shall have the meaning as defined in Article 4.

"**Delivery Pressure**" shall have the meaning as defined in Article 3.4.

"**Delivery Year**" shall mean a period of 12 Months commencing at 00:00 hours on the Commencement Date and ending at 00:00 hours on the same day and month of the succeeding calendar year and each succeeding period of twelve Months thereafter during the term of this Contract.

"**Due Date**" shall have the meaning as defined in Article 11.7.

"**Effective Date**" shall mean the date on which this Contract takes effect as defined in Article 12.

"**Excess Content**" shall have the meaning as defined in Article 3.5.2.

"**Excess Water Content**" shall have the meaning as defined in Article 3.5.3.

"**Fahrenheit Degree**" or "**deg F**" or "**°F**" shall be of or pertaining to a temperature scale that registers the freezing point of water as 32 deg F and the boiling point of water as 212 deg F under standard atmospheric pressure. Whereupon, the temperature conversion formulae are as follows:

deg C = 5/9 (deg F-32)

deg F = 9/5 (deg C)+32

"**Gas**" shall mean the natural gas, consisting primarily of hydrocarbons, (including all liquifiable constituents thereof) to be delivered by Seller and purchased and paid for by Buyer under this Contract that complies with the Quality Specifications.

"**Gas Pressure**" shall mean gauge pressure (difference between the absolute pressure of Gas in the gas pipeline and the atmospheric pressure) expressed in kilogram force per square centimetre (kgf/sq cm) or pounds per square inch gauge (psig).

"**Gross Heating Value**" or "**GHV**" shall mean the number of Btu(s) evolved by the complete combustion of the hydrocarbon components of one standard cubic feet of Gas with excess air when the air and the products of combustion are cooled to the initial temperature of 60 deg F of the Gas and the excess air at the initial pressure of 14.696 psia and when all the water formed by the combustion reaction is condensed to the liquid state.

"**Interest Rate**" shall have the meaning as defined in Article 11.8.

**"Joule"** or **"J"** shall be identical with the definition of the derived SI unit of quantity of heat (J) as defined in International Standard ISO 1000 (SI units and Recommendation for the use of their multiples and of certain other units).

**"Kilogram Force"** or **"kgf"** shall mean the force which accelerates the mass of one (1) kilogram by nine decimal eight zero six six five (9.80665) meter per square second in the direction of the force.

**"Measurement and Testing Centre"** shall have the meaning as defined in Article 6.

**"Minimum Monthly Quantities"** or **"MMQ"** shall have the meaning as defined in Article 2.5.

**"Minimum Monthly Payment"** shall have the meaning as defined in Article 2.7.

**"Month"** shall mean the period beginning at 00:00 hours on the first day of the Gregorian calendar month and ending at 00:00 hours Official Local Time on the first day of the next succeeding calendar month and **"Monthly"** shall be construed accordingly.

**"Monthly Invoice"** shall have the meaning as defined in Article 11.4.

**"Monthly Make-up Quantities"** shall have the meaning as defined in Article 2.7.

**"Monthly Report"** shall have the meaning as defined in Article 9.2 and as more particularly described in the Operation Agreement.

**"Official Local Time"** shall mean Tehran Official Local Time.

**"Operation Agreement"** shall mean the Agreement to be entered into between Seller and Buyer and which shall form an integral part of this Contract.

**"Pipeline"** shall mean the pipeline delivering Gas from the Measurement and Testing Centre to the Delivery Point at Mubarak Field.

**"Properly Nominated Quantities"** shall have the meaning as defined in Article 24.2.

**"Provisional Monthly Report "** shall have the meaning as defined in Article 9.6 and as more particularly described in the Operation Agreement.

**"Quality Specifications"** shall have the meaning as defined in Article 3.1.

**"Reduced MMQ"** shall have the meaning as defined in Article 2.6.

**"Seller's Bank"** shall have the meaning as defined in Article 11.2.

**"Seller's Shortfall"** shall have the meaning as defined in Article 2.5.

**"Standard Cubic Foot"** or **"scf"** shall mean the quantity of Gas occupying 1 (one) cubic foot of volume at 60 degree Fahrenheit (deg f) and at a pressure of 14.696 pound per square inch absolute (psia) and **"Mscf"**, **"MMscf"** and **"Bscf"** shall mean one thousand, one million and one thousand million scf respectively.

**"Taxes"** shall have the meaning as defined in Article 18.1.

**"Year"** shall mean a full Gregorian Calendar Year beginning at 00:00 hours January 1st, and ending at 00:00 hours Official Local Time January 1st of the following calendar year.

1.2   Any units used in this Contract and defined herein shall be identical with the definition of the latest corresponding SI base units as defined by the Eleventh Conference General des Poids et Measures at Paris, France, in 1960 or if not defined thereby, shall be discussed and mutually agreed upon between the Parties.

1.3   Any reference to an Article shall be to an Article of this Contract.

A r t i c l e (2)

## 2   Object of Contract and Sales and Purchase Obligations

### 2.1   Sale and Delivery

For the term of the Contract Seller undertakes and guarantees to sell and deliver Gas to Buyer and Buyer undertakes and guarantees to take delivery of and pay for, or if not taken, to pay for, Gas in accordance with the terms of this Contract.

### 2.2   Contract Gas Supply

It is expressly understood and agreed that the Gas to be delivered by Seller to Buyer under this Contract shall meet the quality and quantity of the Gas as detailed within this Contract.

### 2.3   Daily Contract Quantities (DCQ)

Seller undertakes and guarantees to make available for delivery and sale to Buyer, during the term of the Contract a Daily quantity of Gas herein referred to as "Daily Contract Quantities" or "DCQ" of 330 MMscf/Day except during the first Delivery Year and the first 4 Months of the second Delivery Year when the DCQ shall be 60% of 330 MMscf/Day.

### 2.4   Annual Contract Quantities (ACQ)

Seller undertakes and guarantees to make available for delivery and sale to Buyer, during the term of the Contract an annual quantity of Gas herein referred to as "Annual Contract Quantities" or "ACQ" of 120.45 Bscf/Year-except during the First Delivery Year when the ACQ shall be 60% of 120.45 Bscf/Year and during the second Delivery Year when the ACQ shall be104.40 Bscf/Year (this quantity is determined at the rate of 6.02 Bscf/Month for July to October of the second Delivery Year and at 10.04 Bscf/Month for the remaining 8 Months of the second Delivery Year).

### 2.5   Minimum Monthly Quantities (MMQ)

Buyer undertakes and guarantees to take delivery from Seller during the term of the Contract the following minimum quantities of Gas in each respective Delivery Month as specified hereunder in Article 2.5(a) and 2.5(b) (herein referred to for each such Delivery Month as "Minimum Monthly Quantities" or "MMQ") or nevertheless pay for such quantities, even if not taken as provided in Article 2.7:

(a)   During the Months of:

| | | |
|---|---|---|
| January to April | 6.02 | Bscf/Month |
| May to October | 8.03 | Bscf/Month |
| November to December | 6.02 | Bscf/Month |

3

Except during the first Delivery Year and the first 4 Months of the second Delivery Year when the MMQ shall be 60% of the quantities referred in this Article 2.5(a).

(b) The foregoing Gas quantities in Article 2.5(a) for each Delivery Month shall be reduced by the sum during the Delivery Month concerned of all quantities of:

i) Gas not made available by Seller due to Seller's Force Majeure or Agreed Repairs and Maintenance or necessary repairs or any other reason (herein referred to as "**Seller's Shortfall**") being the difference between the Properly Nominated Quantities and the quantities actually made available; and/or

ii) Gas that has been rejected by Buyer in accordance with Article 3 due to it being Deficient Quality Gas calculated at the Properly Nominated Quantities for the period Buyer rejects such Deficient Quality Gas pursuant to Article 3; and/or

iii) Gas that has not been taken by Buyer due to Force Majeure or Agreed Repairs and Maintenance or necessary repairs, as applicable, being the Properly Nominated Quantities for the period Gas is not taken due to Force Majeure or Agreed Repairs and Maintenance or necessary repairs.

## 2.6 Carry-Forward Quantities and Reduced MMQ

Whenever the quantities of Gas taken and paid for by Buyer in any Delivery Month exceed the MMQ for such Delivery Month, then the excess Gas shall be designated "**Carry-Forward Quantities**".

The Carry-Forward Quantities shall be accumulated during a Delivery Year. Buyer shall have the option at any time to apply part or all of such accumulation to reduce the MMQ (herein referred to as "**Reduced MMQ**") for any subsequent Delivery Month in the same Delivery Year. At the end of such Delivery Year any unused accumulated Carry-Forward Quantities shall not be carried forward to the subsequent Delivery Year.

Buyer shall exercise the aforesaid option by serving notice to Seller in writing not later than the end of the applicable Delivery Month and upon receipt of Buyer's written such notice Seller shall effect the Reduced MMQ in the applicable Monthly Invoice for the said Delivery Month. In this event the Reduced MMQ shall replace the MMQ for that Delivery Month.

## 2.7 Take or Pay or Minimum Monthly Payment

The MMQ as determined in Articles 2.5(a) and 2.5(b) or where applicable the Reduced MMQ as determined in Article 2.6, shall constitute the basis for minimum monthly payment (herein referred to as "**Minimum Monthly Payment**").

9

Should Buyer fail in any Delivery Month to take a quantity of Gas equal to the MMQ (or where applicable the Reduced MMQ) Buyer shall pay for the quantity of Gas actually delivered as well as for the quantity of Gas by which the MMQ (or where applicable the Reduced MMQ) exceeds the quantity of Gas actually taken by Buyer during such Delivery Month at the Contract Price for the said Delivery Month in accordance with the provisions of Article 11.

The quantity of Gas paid for in excess of Gas actually taken by Buyer shall be referred to as **"Monthly Make-up Quantities"**.

### 2.8   Recovery of Monthly Make-Up Quantities

(a)   If in any Delivery Month Buyer fails to take the applicable MMQ and, having made the Minimum Monthly Payment, Buyer shall during the next succeeding 60 Delivery Months or in the event fewer than 60 Delivery Months remain in the Contract, then during the remaining Delivery Months and the subsequent 12 Month period envisaged in Article 2.8 c), have the right to take a quantity of Gas equal to the quantity paid for but not taken during the said Delivery Month, as recovery of Monthly Make-up Quantities provided that during the Delivery Month in which any Monthly Make-up Quantities may be recovered, Buyer shall first have taken the MMQ (or where applicable the Reduced MMQ) and provided further, that Buyer shall in no event be entitled to nominate and take any Daily quantity (including Monthly Make-up Quantities) exceeding the applicable DCQ.

(b)   In each Delivery Month when Buyer offtakes any Monthly Make-up Quantities, such Monthly Make-up Quantities shall be paid for at a price equal to the Contract Price applicable during the said Delivery Month in which the said Monthly Make-up Quantities are recovered, and the relevant Monthy Invoice shall be reduced by the value of such Monthly Make-up Quantities which Buyer has already paid for, on the basis of "first paid first made up".

(c)   If at the date of termination of this Contract as set out in Article 12 there exist any Monthly Make-up Quantities, Seller shall deliver and Buyer shall take such quantities as soon as practicable but in any case within 12 Months after the date of termination at not less than applicable MMQ (except during the last Month in which Monthly Make-up Quantities are recovered) as specified in Article 2.5 herein otherwise any quantity of Gas taken less than MMQ shall be waived by Buyer provided Seller has made available Properly Nominated Quantities. In such event Buyer shall not be entitled to recover such waived Gas quantity or to be refunded for such waived Gas quantity. At the end of the aforesaid 12 Month period any outstanding amounts paid to Seller in relation to Monthly Make-up Quantities not recovered shall be refunded forthwith by Seller to Buyer.

During the aforesaid 12 Month period when Buyer is entitled to take any Monthly Make-up Quantities subject to this Article 2.8 c) all relevant terms and conditions of this Contract other than the take-or-pay obligations set out in Article 2.7 shall be deemed to apply *mutatis mutandis* during that period.

10

(d) When Monthly Make-up Quantities are recovered during the aforesaid 12 Month period then such Monthly Make-up Quantities shall be paid for at a Contract Price determined in accordance with Article 10 for each Month during which such Monthly Make-up Quantities are delivered less the value of equivalent Monthly Make-up Quantities as already paid for on the basis of "first paid first made up". In the event the value of recovered Monthly Make-up Quantities is lower than the value of equivalent Monthly Make-up Quantities which were originally paid for then Seller shall refund all such differences of value to the Buyer forthwith at the end of the 12 Month period.

## 2.9   Implementation of Article 2

For the purposes of clarity example calculations are provided as Annex 1 to assist in the construction and implementation of this Article 2.

Both Seller and Buyer shall keep accounts of the quantities of Gas (if any) which, on any Delivery Month:

(a) Seller failed to make available due to reasons for which it claimed Force Majeure;

(b) Buyer failed to take due to reasons for which it claimed Force Majeure;

(c) Seller did not make available or Buyer did not take because of Agreed Repairs and Maintenance;

(d) Seller failed to make available due to reasons other than Force Majeure and Agreed Repairs and Maintenance;

(e) Buyer did not take due to the Gas being Deficient Quality Gas.

## 2.10   Annual Confirmation

If requested by either Party an annual statement consisting of all Monthly Make-Up Quantities not offtaken by the Buyer at the end of each Calendar Year and as at 20th March of each calendar Year a list of outstanding Monthly Make-up Quantities and the arithmetic sum of the relevant quantities and the values shall be prepared and confirmed by the Parties.

11

A r t i c l e (3)

## 3  Quality of Gas and Delivery Pressure

### 3.1  Quality Specifications

The Gas to be delivered to Buyer under this Contract shall comply at the Measurement and Testing Centre with the following specifications herein called "**Quality Specifications**":

(a) Maximum nitrogen ($N_2$) content of 5 mole percent;

(b) Maximum carbon dioxide ($CO_2$) content of 5 mole percent;

(c) Maximum hydrogen sulphide ($H_2S$) content of 3.3 mole percent;

(d) Maximum water content of 200 kgs/MMscf during the first Delivery Year and the first four Months of the second Delivery Year and thereafter maximum water content of 3.2 kgs/MMscf.

### 3.2  Prediction of Gas Composition

Six months prior to the commencement of each Delivery Year, Seller shall give Buyer the expected analysis of the Gas to be supplied to Buyer for such Delivery Year. Terms and procedures for submitting the said analysis shall be specified in the Operation Agreement.

### 3.3  Resumption of Deliveries

For the resumption of deliveries, Seller shall have made available applicable quantities of Gas and Buyer shall take such Gas immediately after:

(a) the expiration of Force Majeure; or

(b) the completion of Agreed Repairs and Maintenance, or other remedial actions by either or both of the Parties,

which have caused a reduction in or complete stoppage of delivery and/or taking of the applicable quantities of Gas.

### 3.4  Delivery Pressure

The static Gas Pressure taken from a pressure measurement device located immediately downstream from the Delivery Point (herein referred to as "**Delivery Pressure**") shall not be less than 1300 psig for the first 15 Delivery Years. The method of recording and reporting the Delivery Pressure shall be stipulated in the Operation Agreement.

### 3.5  Deficient Quality Gas

**3.5.1**  In the event Seller delivers Gas with pressure at the Delivery Point less than 1300 psig during the first 15 Delivery Years, that quantity of Gas

12

shall be considered as **"Deficient Quality Gas"**. In case of such lower pressure Buyer shall have the option to take and pay for such Deficient Quality Gas or reject such Deficient Quality Gas.   In the event after the first 15 Delivery Years the Seller delivers Gas at the Delivery Point at less than 1300 psig, then the quantity of Gas delivered and taken at such lower pressure shall not be considered Deficient Quality Gas.

3.5.2   In the event that the $N_2$ or $H_2S$ or $CO_2$ content of the delivered Gas exceeds the respective value stated in Article 3.1 by up to 20% of that value (**"Excess Content"**) and such Excess Content continues for more than 6 months, the Parties shall negotiate to find a solution (to include agreement on a period for implementation of such solution) within 3 months thereafter.  In the event the Parties do not reach agreement on a solution acceptable to both of them within the aforesaid 3 month period, then such Gas subsequently delivered shall be considered as Deficient Quality Gas and Buyer shall have the option to take and pay for such Deficient Quality Gas or reject such Deficient Quality Gas. If a solution is agreed within the aforesaid 3 month period then during the agreed period for implementation Buyer shall continue to take Gas with such Excess Content.

In the event that the $N_2$ or $H_2S$ or $CO_2$ content of the delivered Gas exceeds by or beyond 20% the respective value stated in Article 3.1 then the Gas shall be considered Deficient Quality Gas and Buyer shall have the option to take and pay for such Deficient Quality Gas or reject such Deficient Quality Gas.

3.5.3   In the event the water content of the delivered Gas exceeds the value stated in Article 3.1 (**"Excess Water Content"**) then the Seller shall use its best endeavours to eliminate such Excess Water Content as soon as possible and in any event within a period of two months from the first day of such Excess Water Content, failing which such Gas shall be considered as Deficient Quality Gas and Buyer shall thereafter have the option to take and pay for such Deficient Quality Gas or reject such Deficient Quality Gas.  Upon successful elimination by Seller of such Excess Water Content, which shall be by supply of Gas without Excess Water Content for a continuous period of 30 Days, any subsequent incidence of Excess Water Content shall be considered a new incidence to be calculated from the first day of such new incidence of Excess Water Content and the provisions of this Article 3.5.3 shall be construed accordingly.

13

## A r t i c l e (4)

### 4      Delivery Point

#### 4.1      Delivery Point

Without prejudice to Article 4.2 b), the Delivery Point shall be the isolation flange on the Pipeline riser at the AP-Platform (or any other platform bridge-linked to the AP-Platform (to be mutually agreed upon by the Parties)) in the Mubarak complex. The quantities of Gas to be made available to Buyer by Seller shall be tested, measured and invoiced at Measurement and Testing Centre and carried and delivered by Seller to Buyer at the Delivery Point.

#### 4.2      Title, Control and Possession

a)      Title, control and possession of Gas delivered hereunder shall be passed to Buyer at Delivery Point without prejudice to Article 4.2 b).

b)      Gas shall be measured and tested at the Measurement and Testing Centre with or without the presence of the Buyer's representative, who shall be entitled to have access at all times to the Measurement and Testing Centre, and Buyer undertakes to take Gas and pay for based on the quantities and qualities of Gas tested and measured at the Measurement and Testing Centre. Subject to Article 9, the documents prepared at the Measurement and Testing Centre (with or without the presence of Buyer's representative) in respect of quality and quantity of Gas shall be sufficient for invoicing requirements as set out in this Contract. Subject to Article 4.2 c) any Articles in this Contract being in contradiction to the procedure set out in this Article 4.2 b) shall be overruled by the context of this Article 4.2 b).

c)      Seller shall have full responsibility with respect to such Gas made available hereunder or on account of anything which may occur with respect to such Gas after it has been made available at Measurement and Testing Centre up to the Delivery Point. Any Gas losses that occur during transmission in the Pipeline shall be reimbursed forthwith by Seller to Buyer at the Contract Price originally paid for. The quantification of such Gas losses shall be by mutual agreement or failing such agreement quantified and certified by an independent expert to be appointed by the Parties. The details of this procedure shall be stipulated in the Operation Agreement.

#### 4.3      Buyer's Costs

All costs and expenses incurred by the Buyer downstream of the Delivery Point, as well as risks related thereto, shall be borne by Buyer. Seller shall provide boarding and lodging for Buyer's representative at the Measurement and Testing Centre. However, Buyer shall bear all costs (including boarding and lodging) of its representative at the Measurement and Testing Centre.

**4.4    Seller's Costs**

All costs and expenses incurred by the Seller for delivering Gas up to Delivery Point, as well as risks related thereto, shall be borne by Seller.

**4.5    Insurance for Operations**

The Parties shall be responsible for insuring the risks involved in their respective operations and the damages and losses, injuries, death or any claims arising therefrom.

**4.6    Management Committee**

A Management Committee represented by senior members of the Parties shall be set up to manage and control all activities to keep the overall operations in good order for safe and constant delivery and taking Gas.  The function of such Management Committee shall be stipulated in the Operation Agreement.

15

## A r t i c l e (5)

### 5      Commencement of Delivery

**5.1**   The commencement date shall be January 1st 2003 (hereinafter referred to as "Commencement Date") when the Pipeline and other required facilities such as the Measurement and Testing Centre in Iran are expected to be completed. No revisions to the Commencement Date shall be made without the prior written consent of the Buyer and Buyer shall not request any revision of the Commencement Date.

**5.2**   With due regard to the provisions of Article 2, the making available of Gas by Seller, and the taking of or paying for such Gas by Buyer, under the terms and conditions of this Contract shall commence on the Commencement Date.

**5.3**   The first Delivery Year shall commence at 00.00 hours of January 1st 2003 and shall end at 00.00 hours of the same day and month of the next following year.

**5.4**   In the event quantities of Gas less than 60% of 330 MMscf/Day are available for delivery to Buyer prior to the Commencement Date and Buyer is in a position to accept delivery of such quantities then the Seller and Buyer shall agree on the terms and conditions of a sale and purchase of such Gas using the same Contract Price and pricing formula set out in Article 10.2 of this Contract.

16

## A r t i c l e (6)

**6      Measurement and Testing Centre**

6.1     The term **"Measurement and Testing Centre"** shall mean the centre where the Gas to be delivered is measured and tested. The Measurement and Testing Centre shall be located at a suitable location offshore or onshore of the I.R of Iran under absolute discretion of the Seller. Such location shall be notified to the Buyer as soon as determined by Seller but no later than 6 months prior the Commencement Date.

6.2     All matters relating to measurement and testing of the pressure, quality and quantity of Gas and procedures in relation thereto shall be specified in the Operation Agreement without prejudice to the rights and obligations set out herein.

17

**A r t i c l e (7)**

**7      Gas Control and Communication**

**7.1**   All matters relating to the control of Gas deliveries and communications shall be stipulated in the Operation Agreement without prejudice to the rights and obligations set out herein.

**7.2**   All matters relating to the access and inspection of each Party's facilities in the context of this Contract shall be stipulated in the Operation Agreement without prejudice to the rights and obligations set out herein.

18

**A r t i c l e (8)**

## 8     Gas Transmission System

All matters relating to the operation of the Seller's and Buyer's transmission facilities affecting delivery and taking of Gas and connection of Pipeline at a suitable platform riser flange in the Mubarak complex shall be stipulated in the Operation Agreement.

19

A r t i c l e (9)

**9   Daily and Monthly Report**

**9.1**   The quantity and quality of Gas measured and tested at the Measurement and Testing Centre during each Day shall be indicated in a Daily report (herein referred to as **"Daily Report"**) to be issued and signed by the representatives of Seller and Buyer (if present) according to a procedure to be set forth in the Operation Agreement.

**9.2**   The representatives of Seller and Buyer (if present), after having summarized all data measured and recorded in the Daily Report, shall determine the quantity and quality of Gas measured and tested during each Delivery Month and shall issue and sign a Monthly report (herein referred to as **"Monthly Report"**) within ten (10) days after the end of the said Month.

**9.3**   In the event of any dispute between Seller and Buyer on the Daily and Monthly Gas quality and/or quantity determination, representative of Buyer shall sign the Daily and or Monthly Report indicating its remarks and/or objections within the period to be provided for in the Operation Agreement.

**9.4**   The quantities, and conformity with the Quality Specifications of Gas measured and tested under this Contract, shall be measured and tested in accordance with the procedures and methods set out in the Operation Agreement which shall include, inter alia, appropriate provisions regarding:

   a)   Definition of responsibilities for measurement and tests.

   b)   Methods, standards and frequency of testing to determine quality, and frequency and methods for calibration of quality testing equipment.

   c)   Methods and standards for measuring quantities delivered and frequency and methods for calibration of measurement equipment.

   d)   Agreed limits of accuracy of the measurement system and its components, and the procedures for correction of measured quantities and qualities in the event equipment is found to be operating outside agreed limits of accuracy or fails completely.

**9.5**   In the event of any dispute on the measurement of quantity and/or determination of quality of Gas at the Measurement and Testing Centre and should the Parties not reach an amicable agreement thereon the dispute shall be settled by an independent internationally recognised laboratory chosen by mutual consent of the Parties and set out in the Operation Agreement. If the Parties do not reach agreement on the choice of said laboratory such choice shall be settled in accordance with Article 22 hereof, it being understood that pending the arbitration award, discrepancies shall be settled by such laboratory last appointed. The decision of such laboratory shall be final and binding upon both Parties. The cost of services of such laboratory shall be charged to the Party proved to be in error.

20

9.6    In the event of any dispute between Seller and Buyer on the determination of the quantities and/or quality of Gas measured and tested, a provisional Monthly report (herein referred to as **"Provisional Monthly Report"**) shall be issued within 10 Days after the end of the relevant Delivery Month on the basis of the arithmetic average of the quantities and/or quality determined by the representatives of Seller and Buyer. This Provisional Monthly Report shall have the same validity as the Monthly Report for payment purposes.

After the settlement of any discrepancy in accordance with the procedure specified in Article 9.4 hereof the difference shall be adjusted in the first Monthly Report (or Provisional Monthly Report) after final decision by the Parties or the laboratory, as the case may be.

9.7    In the event the representative of the Buyer is not present to sign the Daily Reports, the Daily Reports shall be kept by the representative of the Seller to be signed by the representative of the Buyer within 10 Days from the end of each Delivery Month.  In the event the Buyer's representative is not present at the Measurement and Testing Centre to sign the Daily, Monthly or Provisional Monthly Reports within 10 Days from the end of the same Delivery Month or in the event of not signing the aforesaid reports within 10 Days from the end of the same Delivery Month by the Buyer's representative, then the Daily and/or Monthly Reports and/or Provisional Monthly Reports signed by the representative of Seller shall be final and acceptable to Buyer and Buyer shall have no objection later in this regard.

21

# Article (10)

## 10    Contract Price for Gas

### 10.1    Determination of Contract Price for Gas

The price of the Gas at the Delivery Point shall be calculated based on the Monthly Report or the Provisional Monthly Report and on the following basis:

(a)    The price, in US Dollars per Mscf under the Contract shall be calculated each Delivery Month for the resulting Average Weighted GHV of the Gas (such price of Gas for each Delivery Month being herein referred to as the "Contract Price").

(b)    The Contract Price of Gas shall be determined in accordance with the formulae provided in Articles 10.2 and 10.3 hereof and shall be reported to six (6) decimal places and shall be rounded up if the seventh decimal figure is 5 to 9 and rounded down if the seventh decimal figure is 0 to 4.

(c)    The Contract Price payable for Gas under the Contract (whether or not taken at the time) shall be inclusive of all taxes, fees, levies or other assessments imposed in the I. R. of Iran.

### 10.2    Contract Price of Gas Prior to 8th Delivery Year

The Contract Price of Gas for each Delivery Month prior to the 8th Delivery Year shall subject to Article 10.5 be calculated in accordance with the following formula:

$$G_n \quad = $$

### 10.3    Contract Price of Gas After the First 7 Delivery Years

The Contract Price of Gas for each Delivery Month after the 7th Delivery Year shall subject to Article 10.5 be calculated in accordance with the following formula:

$$G_n \quad = $$

### 10.4    Nomenclature

(1)    The alphabetical symbols used in the formulae in Articles 10.2 and 10.3 shall have the following meanings:

$G_n$    =    Contract Price.

H    =    Average Weighted GHV of Gas in Btu/scf as determined for

22

the Delivery Month for which $G_n$ is being calculated.

$P_{n-1}$ = Average Crude Oil Price in the Delivery Year immediately preceding the Delivery Year for which $G_n$ is being calculated.

$\Delta_1$ = The value of H in excess of 1000 Btu/scf ($\Delta_1 = 0$ for values of H less than 1000 Btu/scf).

(2) The "**Average Crude Oil Price**" for any Delivery Year shall be a US Dollar amount which is the arithmetic average of the daily spot quotations for the Dubai and Oman crude oil prices for such Delivery Year as published by Platts Oilgram Price Report.

## 10.5   Minimum Gas Price

Notwithstanding Articles 10.2 and 10.3 the Contract Price of Gas for each Delivery Month shall not be less than .    US Dollars per Mscf.

## 10.6   Inability to Determine Contract Price

(1) In the event that the Platts Oilgram Price Report ceases to be published or ceases to contain spot quotations for the Dubai and Oman crude oil prices, the Parties shall endeavor to agree upon:

(a) a substitute publication for the Platts Oilgram Price Report containing spot quotations for the Dubai and Oman crude oil prices which spot quotations correspond to those previously contained in the Platts Oilgram Price Report; and

(b) the first period in which such substitute publication shall be used to determine the Contract Price.

If the Parties are unable to reach agreement as above within 180 days after the last publication of spot quotations for the Dubai and Oman crude oil prices in the Platts Oilgram Price Report, the matter shall be referred to arbitration pursuant to Article 22 hereof. Till the time the award becomes final and binding on the Parties the Average Crude Oil Price used for calculating the Contract Price shall be the last Average Crude Oil Price used before the Platts Oilgram Price Report ceased publication. Upon the finalisation of the award the Parties shall adjust the payments already made along with interest for such adjusted amount in accordance with Article 11.7, such adjustment shall be accounted for in the next Monthly Invoice.

(2) In the event that any other constituent used in the formulae in Articles 10.2 and 10.3 can not be determined for whatever reason, the Parties shall endeavour to agree upon an appropriate substitute and the first period in which such substitute shall be used to determine the Contract Price. If the Parties are unable to reach agreement within 180 days, the matter shall be referred to arbitration pursuant to Article 22 hereof.

23

Till the time the award becomes final and binding on the Parties the constituents used for calculating the Contract Price shall be the last available constituent used before such constituent could not be determined. Upon the finalisation of the award the Parties shall adjust the payments already made along with interest for such adjusted amount in accordance with Article 11.7, such adjustment shall be accounted for in the next Monthly Invoice.

## 10.7   Price Revision

If at any time the circumstances of the energy market in the region, beyond the control of the Parties, significantly change (as compared to what the Parties reasonably expected at the Effective Date) then either Party may notify the other Party in writing to enter into negotiations to revise the Contract Price formulae. The Party making such request shall provide details to substantiate such Contract Price formulae revision. The Parties shall use their best endeavours to reach a reasonable revision of the Contract Price formulae.

In the event the Parties are unable to agree a Contract Price formulae revision within a period of 6 Months from the date of serving the said notice then the dispute shall be referred to arbitration under Article 22 hereof. Until an agreement is reached on the Contract Price formulae revision or until an arbitral award has been issued the provisions of the Contract shall remain in force.

24

**A r t i c l e  (11)**

## 11  Invoicing and Payment

### 11.1  Accounting Period

The accounting period for the Gas delivered and (if applicable) for the Gas not taken but nevertheless paid for, shall be each Delivery Month.

**11.2**  **"Seller's Bank"** shall be Bank Markazi Jomhuri Islami Iran (the Central Bank of the Islamic Republic of Iran)("BMJII") or any other Bank nominated by Seller from time to time and notified by Seller to Buyer.

**11.3**  **"Buyer's Bank"** shall be a bank to be selected by Buyer from time to time from the list of banks approved by BMJII, provided to Buyer by Seller from time to time.

**11.4**  Within 20 Days after the end of each Delivery Month Seller shall prepare and send to Buyer through Seller's Bank, an invoice, one duly signed original and four copies  (in two separate mailings) (herein referred to as **"Monthly Invoice"**). Monthly Invoices shall be accompanied by a Monthly Report (or Provisional Monthly Report as applicable) as specified in Article 9 hereof.

The said documents shall also be accompanied by the receipt of an international courier showing that a set of such documents has been sent for urgent delivery to the Buyer.

### 11.5  Expression of Quantities and GHV

All quantities of Gas shall be expressed in MMscf and MMBtu.

### 11.6  Payment

a)  Payment shall be made by Buyer in US Dollars in accordance with instructions of Seller's Bank to Buyer's Bank.  In the event Seller's Bank instructs the Buyer's Bank with respect to the payment of a Monthly Invoice and such instructions are carried out by Buyer's Bank then the carrying out of such instructions by Buyer's Bank shall be considered as fulfillment of Buyer's obligations to make payment to Seller with respect to such Monthly Invoice.

b)  For payment of the Monthly Invoices Seller shall send to Buyer not later than the15th calendar day following the Delivery Month a telex or fax-invoice during the Buyers' office hours indicating the particulars of the Monthly Invoice for such Delivery Month which shall include the following information:

i)  The total quantity of Gas delivered during such Delivery Month;

ii)  The MMQ or Reduced MMQ (as the case may be) for such

25

Delivery Month;

    iii)    The amount of Gas (if any), which Buyer was obliged to take but failed to take and hence has to pay for in such Delivery Month;

    iv)    The amount (if any), of Monthly Make-up Quantities which Buyer was entitled to take during such Delivery Month;

    v)    The daily applicable Gross Heating Value in Btu/scf as measured and/or determined at the Measurement and Testing Centre during each Day of such Delivery Month as well as Average Weighted GHV in Btu/scf for the said Delivery Month;

    vi)    The Contract Price in US Dollar/Mscf as determined pursuant to Article 10 applicable for such Delivery Month;

    vii)    The total amount of money owing by Buyer to Seller for Gas delivered during such Delivery Month;

c)    Following the Monthly telex or fax-invoice, Seller shall send to Buyer not later than the 20th day of the next subsequent Month after the Delivery Month, a Monthly Report relating to the said Delivery Month, through an international courier service.

d)    In the event Buyer disputes any amount concerning a Monthly Invoice, Buyer shall notify Seller in writing specifying the reasons therefor. However, Buyer shall pay the Monthly Invoice amount in full, and upon settlement of the dispute, the relevant amount, shall be adjusted (with interest as calculated in accordance with Article 11.6 with the first next Monthly Invoice issued by Seller to Buyer.

e)    Bank expenses connected with payments of the Monthly Invoices shall be for Buyer's account in United Arab Emirates and shall be for Seller's account in the Islamic Republic of Iran.

## 11.7   Due Date

The amount of each Monthly Invoice shall be paid by the latest of 30 calendar days after the end of the relevant Delivery Month, or 15 calendar days from the date of receipt by Buyer of the applicable telex or fax- invoice.If the due date for payment falls on a bank holiday, payment shall be made on the first following banking day (herein referred to as "Due Date").

## 11.8   Late Payment

a.    If Buyer delays the payment of any due amount (i.e. the full amount or balance of any Monthly Invoice) on the Due Date then the amount remaining unpaid shall be subject to interest.

b.    The interest rate to be applied to such delayed payment shall be the prevailing LIBOR (London Inter Bank Offered Rate) for one-year US

Dollar deposit of the Bank of Tokyo and Mitsubishi quoted by Reuter (or any other quotation as may be agreed by the Parties from time to time) at Due Date plus 3.5 percent (hereinafter referred to as "**Interest Rate**").

c.    If the payment is effected within one month of the Due Date, then a simple fraction of exact number of late payment days from Due Date multiplied by $1/12^{th}$ of the Interest Rate shall be applied to the outstanding amount to calculate late payment interest.

d.    If the payment is not made within 30 Days of the Due Date then the total of principal and accrued interest due as calculated in Article 11.7 c) will be subject to Interest Rate. The same procedure as provided for hereinabove shall be effective until the date when full payment is actually made.

**11.9**   The Parties shall co-operate to find efficacious means of transferring funds from Buyer to Seller and in the absence of finding an agreed mechanism shall rely on the Uniform Rules for Collections published and/or revised by the International Chamber of Commerce, suitably modified to take into account the terms hereof, without prejudice to the rights and obligations of the Parties.

27

**A r t i c l e (12)**

## 12    Term of Contract

12.1   This Contract shall be effective from the date of signature by the Parties (herein referred to as "**Effective Date**" and shall be valid until the end of the 25 (twenty-five) full Delivery Years stipulated herein.

12.2   Three (3) years before this Contract is scheduled to expire, the Parties hereto shall, upon written notification of either Party, enter into negotiations, in good faith, to determine terms and conditions for the extension of this Contract for a further period of five (5) Delivery Years.

12.3   For the purpose of the extension of the Contract as stipulated in Article 12.2 above, Seller and Buyer shall negotiate in good faith to reach agreement satisfactory to both Parties. The negotiations shall be concluded within 12 (twelve) Months of their initiation as aforesaid.

12.4   If the Parties fail to reach agreement on the terms and conditions of the extension, this Contract shall terminate as provided in Article 12.1 hereof.

### A r t i c l e (13)

## 13    Force Majeure

**13.1**    In the event that either Seller or Buyer is rendered unable wholly or in part by Force Majeure (being, subject to what is hereinafter provided, any event or circumstance beyond the reasonable control of the Party affected such as but not limited to acts of God, and/or acts of nature, lockouts, wars declared or undeclared, blockades, insurrections, terrorist acts, epidemics, landslides, earthquakes, fire, storms, floods, washouts, explosions, unavoidable accidents) to carry out their obligations under this Contract, other than to make payments due or serve notices due hereunder, it is agreed that, upon written notice by such Party giving full particulars of such Force Majeure circumstances to the other Party as soon as possible after the discovery of the occurrence of said circumstances which constitute Force Majeure, the obligations of the Party giving such notice, so far as they are affected by such Force Majeure, shall be suspended during the continuance of any inability so caused, and the Party so affected shall not be deemed to be in breach of this Contract.

However, such circumstances constituting Force Majeure shall, as far as possible, be remedied with all reasonable dispatch.

Seller or Buyer shall give notice and reasonably full particulars of any Force Majeure in writing delivered by telex or telegraph to the other Party within 6 working days after such Force Majeure occurs. The Party claiming relief on account of Force Majeure shall as soon as practicable give detailed written notice to the other Party, all information available about the relevant Force Majeure circumstances, the relevant facts and consequences, and a statement of steps and time believed necessary to remedy the Force Majeure situation and shall reasonably afford access to its facilities for a site inspection if desired by the other Party, at the expense and risk of said other Party who makes such inspection. Each Party shall use its reasonable efforts to minimize the effect of any Force Majeure situation.

**13.2**    Circumstances of Force Majeure in the I. R. of Iran shall include acts of Parliament of I. R. of Iran of general application and circumstances beyond the reasonable control of Seller affecting Gas production facilities in Iran, transmission systems, pipelines and measurement and testing system at Measurement and Testing Centre and the Pipeline.

**13.3**    Should it be foreseen that circumstances of Force Majeure and/or the effects thereof may exceed a continuous period of 6 Months, the Parties shall negotiate and endeavour, in good faith, to find a solution acceptable to both Parties. If the Parties do not find an acceptable solution within the said 6 Month period, the Party not affected by Force Majeure may terminate this Contract by giving a 6 Month written notice to the other Party. Such notice shall take effect on the date that it is served, provided that:

(a)    the written notice referred to above shall not take effect if prior to the 6

29

Month period the Party affected by Force Majeure has resumed performance of all of its obligations under this Contract; and

(b)  until the written notice referred to above takes effect, the Parties shall meet together so as to endeavour in good faith to agree upon alternative arrangements (including timetable) for the delivery and taking of Gas.

30

**A r t i c l e (14)**

## 14   Language

All communications with regard to this Contract shall be in the English language.

31

**A r t i c l e (15)**

## 15   Confidentiality

**15.1**   Neither of the Parties hereto shall, without the written consent of the other Party, disclose to any third party the existence, terms and conditions of this Contract nor any plans, drawings, reports, records, scientific and technical data, notes and other similar information related to this Contract, as well as related documents, except where such disclosure is reasonably required in connection with the implementation of this Contract. In the event of such latter required disclosure, the disclosing Party shall exercise due precaution to avoid improper disclosure (particularly disclosure to the media) thereof by any such third parties.

**15.2**   For the purposes of the provisions of this Article 15, the pertinent governmental authorities of the Parties concerned and financial institutions (if required for financing any Party in relation to this Contract) shall not be deemed to be third parties, provided that these latter entities are similarly bound to these confidentiality undertakings by the respective Parties.

32

**A r t i c l e (16)**

## 16    Assignment

16.1    Neither Party shall, without obtaining the prior written consent of the other, be entitled to assign this Contract or any rights and obligations hereunder to any other party, which consent in case of a subsidiary of a Party (an entity of which a Party owns or controls, directly or indirectly, majority of the voting rights) shall not be unreasonably withheld.

16.2    In the event of any assignment, the assignor shall not be released or relieved from any of its obligations hereunder nor shall the assignor be discharged from any further obligations or further liabilities thereafter occurring under or in connection with this Contract.

16.3    The assignor and assignee shall be severally and jointly liable for carrying out the obligations in this Contract.

## A r t i c l e (17)

## 17   Meetings

### 17.1   Frequency

It is hereby agreed that representatives of both Parties shall (unless the Parties agree otherwise) meet not less than once a year to discuss points of mutual interest.

### 17.2   Time and Place

The time and place of such meetings shall be agreed upon by the Parties in each particular case.

34

**A r t i c l e ( 18 )**

## 18   Taxes And Charges

18.1   The Buyer shall be liable for payment of all taxes, duties, royalties, levies, imposts, fees or any other charges of any kind whatsoever (herein referred to as "**Taxes**") outside the Islamic Republic of Iran related to the execution and performance as well as assignment of the Contract or transmitting, selling and buying of Gas pursuant to or in connection with the Contract.

18.2   The Seller shall be liable for payment of all Taxes in the Islamic Republic of Iran related to the execution and performance as well as assignment of the Contract or transmitting, selling and buying Gas pursuant to or in connection with the Contract.

35

**A r t i c l e (19)**

## 19    Amendments

19.1    Any amendment and/or addition to this Contract shall be valid only if made in writing and signed by authorized representatives of the Parties.

19.2    The Parties hereby agree that, following the date of signature of this Contract all previous negotiations and/or correspondence (including MOU's) between Seller and Buyer in connection with this Contract shall be considered as null and void, and shall not be used in any way whatsoever for construction or interpretation of any provision of this Contract.

36

**A r t i c l e (20)**

## 20 Ineffective Provisions, Headings and Exchange of Information

### 20.1 Ineffective Provisions

If any of the provisions of this Contract is proven to be ineffective by one Party to the other, the effectiveness of the other provisions shall not be affected. In such event the Parties shall negotiate, in good faith, with a view to agreeing on substituting provisions for such ineffective provisions, which achieve an economic result as similar as possible to that of the ineffective provisions.

### 20.2 Headings

Title headings contained in this Contract are for identification and reference purposes only and shall be disregarded for the purpose of construing the rights and obligations of the Parties.

### 20.3 Non-Waiver and Future Default

Waiver by either Seller or Buyer of any one or more defaults by the other in the performance of any provisions of this Contract shall not operate or be construed as a waiver of any future default or defaults, whether of a like or of a different nature.

### 20.4 Reasonable Information

Each Party shall, during the term of this Contract, give to the other, all information as may be reasonably requested to enable each Party to carry out its obligations hereunder.

37

**A r t i c l e (21)**

## 21   Notices

Any notice, request, demand, statement or invoice provided for herein, or any notice which either Party may desire to give to the other, shall be in writing and shall be considered duly delivered five (5) days after dispatching by international courier addressed to said Party at the address as specified below, or at such other address as either Party may hereinafter designate in writing.

Routine communications including Monthly Invoices and Annual Statements and notice of payment, shall be considered as duly delivered when dispatched by telex or facsimile confirmed by sending the original copy via registered airmail or international courier.

**Address of the Parties:**

Seller:    National Iranian Oil Company
Taleghani Avenue, Tehran, I.R. of Iran, P.O. Box 1863
Telex      : To be advised
Telephone  : (98-21) 6151
Telefax    : (98-21) To be advised

Buyer:    Crescent Petroleum Company International Limited
Crescent Tower, Al Buhaira Corniche, P.O.Box 2222,
Sharjah, United Arab Emirates
Telex      : 78015CRESPT EM
Telephone  : (971-6) 5727000
Telefax    : (971-6) 5726000, 5562732

38

**A r t i c l e (22)**

## 22 Governing Laws and Arbitration

### 22.1 Governing Law

This Contract shall be governed by and interpreted in accordance with the Laws of Islamic Republic of Iran.

### 22.2 Arbitration

The Parties shall use all reasonable efforts to settle amicably within 60 days, through negotiations, any dispute arising out of or in connection with this Contract or the breach, termination or invalidity thereof. Any dispute, controversy or claim arising out of or relating to this Contract, or the breach, termination or validity or invalidity thereof shall be finally settled by arbitration before three arbitrators, in accordance with a "Procedures for Arbitration" (attached hereto as Annex 2) which will survive the termination or suspension of this Contract. Any award of the arbitrators shall be final and binding upon the Parties. Either Party may seek execution of the award in any court having jurisdiction over the Party against whom execution is sought.

39

**A r t i c l e (23)**

## 23    Warranty

The Parties represent that each of them has the lawful right to enter into and perform all terms and conditions hereof.

**A r t i c l e ( 24 )**

## 24     Annual and Monthly Purchase Programming

24.1    Without prejudice to the rights and obligations of each Party under this Contract, Buyer undertakes to communicate to Seller its intended monthly purchase programmes as follows:

a)     Six months before the commencement of each Delivery Year Buyer shall notify Seller the total quantities of Gas which Buyer intends to purchase in such Delivery Year.

b)     Three months before the commencement of every Delivery Year, Buyer shall notify Seller its intended purchase programme for the first six Months of such Delivery Year.

c)     Three months before the end of the first six months of every Delivery Year, Buyer shall notify Seller the monthly purchase programme for the second six months of such Delivery Year.

d)     Buyer's failure to communicate such information mentioned in this Article shall not affect the Parties' rights and obligations concerning delivery and purchase of Gas pursuant to this Contract.

e)     A nomination procedure shall in other respects be set out in the Operation Agreement to the extent it is required to meet the Gas nomination requirements of the end users of the Gas.

24.2    Three months before each Delivery Month Buyer shall modify or confirm its aforesaid nominated quantities for the said Delivery Month.  These modified or confirmed quantities shall be referred to herein as **"Properly Nominated Quantities"** and shall be used only for calculating the Seller's Shortfall as defined in Article 2.5.b(i) and for the purposes of Article 2.5 b (ii), (iii) and Article 2.8 c).  In the event Buyer fails to modify or confirm its aforesaid nominated quantities the quantities most recently nominated pursuant to Article 24.1 shall be considered Properly Nominated Quantities. In the event Buyer fails to provide such nominations for a Delivery Month then there shall be no Seller's Shortfall for that Delivery Month.

24.3    The communication of intended Monthly purchase programmes and Properly Nominated Quantities shall not create an obligation on Buyer to take such quantities but shall not release Buyer from its take or pay obligations set out in Article 2.

41

A r t i c l e (25)

## 25    Mutual Indemnity

**25.1**   Buyer shall be liable for and defend, indemnify and hold harmless Seller against any and all liability and claims (howsoever they may arise) for death, injury or illness of officers, directors, employees and agents of Buyer arising out of, or connected with, operations under this Contract or the Operation Agreement.

**25.2**   Seller shall be liable for and defend, indemnify and hold harmless Buyer against any and all liability and claims (howsoever they may arise) for death, injury or illness of officers, directors, employees and agents of Seller arising out of, or connected with, operations under this Contract or the Operation Agreement.

42

A r t i c l e (26)

## 26   Termination

26.1    In addition to causes for termination set forth in Articles 12 and 13 hereof, if for a total of 60 Days during a Delivery Year for reasons other than Force Majeure and Agreed Repairs and Maintenance, Seller fails to deliver the quantity of Gas required under terms and conditions hereof, Buyer may serve written notice on Seller to the effect that Seller should adhere to the delivery obligations hereunder within one month from the date of serving said notice.   Failure by Seller to so adhere will entitle Buyer to terminate this Contract or refer any arising loss or claim to arbitration under Article 22 hereof.

26.2    In addition to causes for termination set forth in Articles 12 and 13 hereof, if during the term of this Contract for reasons other than Force Majeure, Agreed Repairs and Maintenance or delivery of Deficient Quality Gas Buyer fails for a total of 60 Days in a Delivery Year to take any Gas under the terms and conditions of this Contract and/or delays for 7 days from the relevant Due Dates payment of any two Monthly Invoices in a Delivery Year in compliance with Article 11 and other terms and conditions hereof, Seller may serve written notice to Buyer to the effect that Buyer should commence taking Gas under terms and conditions in this Contract, or adhere to timely payment obligations hereof, within one month from the date of serving the above mentioned notice.   Failure by Buyer to so adhere will entitle Seller to terminate this Contract or refer any arising loss or claim to arbitration under Article 22 hereof.

26.3    Termination or the right to refer any arising loss or claim to arbitration, as referred to above shall be without prejudice to any other rights and remedies which the Parties may have under this Contract.

In witness whereof, this Contract has been duly executed by the Parties hereto as of the date first written above with 26 Articles and 45 pages.

**Ahmad Rahgozar**
Vice President,
National Iranian Oil Company

**Hamid D. Jafar**
Chairman and Chief Executive
Officer, Crescent Petroleum
Company International Limited

Witness:

Witness:

43

## ANNEX 1

I.  **Sample calculation of the "*MMQ*" in accordance with the provisions of Article 2.5:**

*Example 1*

| | | |
|---|---|---|
| Month | : | January (31 Days) |
| Base quantity | : | 6,020,000 Mscf |
| Properly Nominated Quantity | : | 5,000,000 Mscf |
| Quantity actually made available by Seller | : | 4,900,000 Mscf |
| Seller's Shortfall = 5,000,000 – 4,900,000 | = | 100,000 Mscf |
| Period of Deficient Quality Gas | = | 0.5 Day |
| Period of Agreed Repairs & Maintenance | = | 2 Days |
| Period of Buyer's Force Majeure | = | 1 Day |

$$MMQ = 6,020,000 - 100,000 - (0.5 + 2 + 1) * \frac{5,000,000}{31}$$

**MMQ**  = 5,355,484 Mscf

*Example 2*

| | | |
|---|---|---|
| Month | : | August (31 Days) |
| Base quantity | : | 8,030,000 Mscf |
| Properly Nominated Quantity | : | 10,000,000 Mscf |
| Quantity actually made available by Seller | : | 10,000,000 Mscf |
| Seller's Shortfall | = | Zero Mscf |
| Period of Deficient Quality Gas | = | Zero Day |
| Period of Agreed Repairs & Maintenance | = | Zero Day |
| Period of Buyer's Force Majeure | = | Zero Day |

**MMQ**  = 8,030.000 Mscf

II.  **Sample calculations of the following defined terms:**

(i)  "*Carry-Forward Quantities*",

(ii)  "*Reduced MMQ*"; and

(iii)  "*Monthly Make-Up Quantities*"

all in accordance with provisions of Articles 2.6, 2.7 and 2.8:

_Examples:_

The attached Table 1 provides examples of the above defined terms for 3 consecutive Delivery Years on a Monthly basis. (Table 1 is also provided separately as an inter-active Excel file).

The following describes the various terms and the equations used in Table 1.

"$n$"   =   Month of Table 1

"$n-1$"   =   the previous Month to Month n

"$A_n$"   =   the MMQ for Month $n$ calculated separately as per Section I above and inserted in this Table 1.

"$B_n$"   =   the quantity of Gas actually taken by Buyer during Month $n$ as measured and recorded.

"$C_n$"   =   for Month $n$ the largest of the following:

   —   the Reduced MMQ "$G_n$" or
   —   the difference between $B_n$ and $I_{n-1}$ (definitions of I will follow)

"$D_n$"   =   for Month $n$, if $C_n$ is greater than $A_n$, $D_n$ will be equal to the difference between $C_n$ and $A_n$

"$E_n$"   =   for Month $n$ in a Delivery Year, $E_n$ shall represent the balance unused Carry-Forward Quantities which will be available for use only in subsequent Months of the same Delivery Year.

   E for the Month of December of any Delivery Year shall be set to zero irrespective of the value of E for the previous Month of November.

"$G_n$"   =   for Month $n$, if $B_n$ is larger than $A_n$, then $G_n$ shall be equal of $A_n$, but if $B_n$ is smaller than $A_n$, then $G_n$ will be equal to the larger of:

   —   $B_n$, or
   —   the difference between $A_n$ and $E_{n-1}$

"$H_n$"   =   for Month $n$, if $G_n$ is larger than $B_n$, then $H_n$ will be equal to the difference between $G_n$ and $B_n$

"$I_n$"   =   balance unrecovered Monthly Make-Up Quantities, which will be available for recovery during the subsequent Months

III.   **Sample calculations of the _"Minimum Monthly Payment"_ in accordance with the provisions of Article 2.7:**

45

Let $P_n$ represent the Contract Price for Month $n$ (expressed in US$ per Mscf) and $G_n$ represent the Reduced MMQ as calculated above (expressed in Mscf), then for Month $n$ the Minimum Monthly Payment (expressed in US$) shall be:

$$P_n \times G_n$$

*Example:*

If $P_n$ = $\cdot$ : $/Mscf, and
  $G_n$ = 8,030,000 Mscf

then the Minimum Monthly Payment for Month $n$ in US$ shall be

$$\cdot \ \times \ 8,030,000 = US\$ : \quad \cdot$$

**IV.** **Sample calculations of the recovery of Monthly Make-Up Quantities during the normal term of the Contract in accordance with Article 2.8 (a) and (b):**

–  ·  let the Monthly Make-Up Quantities be $H_n$ for Month $n$ and the corresponding Contract Price be $P_n$ for the same Month $n$ ($H_n$ shall be zero for the Months when no Monthly Make-Up Quantities are generated).

Whenever the Buyer is eligible to recover Monthly Make-Up Quantities, Buyer shall do that while observing the following Rules:

*Rule 1*  $H_n$ has a useful life of 60 Months only, after that period any unrecovered quantity of $H_n$ shall be set to zero.

*Rule 2*  Recovery of Monthly Make-Up Quantities shall be done on the basis of first made first recovered but subject to Rule 1 above.

*Rule 3*  Whenever a portion or whole of $H_n$ is recovered, such quantity of Gas shall be multiplied by the relevant $P_n$ to obtain the value of such quantity of Gas as originally paid for by the Buyer.

*Example*

Assume that Month $n$ is the first time when Monthly Make-Up Quantities were generated:

| Let | | | | | | |
|-----|---|---|-------------|-----------|---|-------|
| | $H_n$ | = | 400,000 Mscf | $P_n$ | = | $/Mscf |
| | $H_{n+1}$ | = | 200,000 Mscf | $P_{n+1}$ | = | $/Mscf |
| | $H_{n+2}$ | = | Zero | $P_{n+2}$ | = | $/Mscf |
| | $H_{n+3}$ | = | 100,000 Mscf | $P_{n+3}$ | = | $/Mscf |
| | $H_{n+4}$ | = | 500,000 Mscf | $P_{n+4}$ | = | $/Mscf |
| | $H_{n+5}$ | = | 600,000 Mscf | $P_{n+5}$ | = | $/Mscf |

Assume that in Month $n+7$ Buyer recovered 1,000,000 Mscf of the balance unrecovered Monthly Make-Up Quantities. The amount prepaid by Buyer for such

46

recovery that will be deducted from the Monthly Invoice for Month $n+7$ shall be calculated as follows:

400,000 x 0.60 + 200,000 x        + 100,000 x        + 300,000 x        = US$

The record of the balance unrecovered Monthly Make-Up Quantities will therefore be as follows:

| | | | | | |
|---|---|---|---|---|---|
| $H_n$ | = | Zero | $P_n$ | = | $/Mscf |
| $H_{n+1}$ | = | Zero | $P_{n+1}$ | = | $/Mscf |
| $H_{n+2}$ | = | Zero | $P_{n+2}$ | = | $/Mscf |
| $H_{n+3}$ | = | Zero | $P_{n+3}$ | = | $/Mscf |
| $H_{n+4}$ | = | 200,000 Mscf | $P_{n+4}$ | = | $/Mscf |
| $H_{n+5}$ | = | 600,000 Mscf | $P_{n+5}$ | = | $/Mscf |

V.   **Sample calculations for recovery of Monthly Make-Up Quantity during the 12 Months after the termination of the Contract in accordance with the provisions of Article 2.8 (c) and (d):**

*Example:*

—   Assume that at the time of termination of the Contract as set out in Article 12 there existed a balance unrecovered Monthly Make-Up Quantities of 100,000,000 Mscf.

—   The attached Table 2 provides examples of the recovery of such balance, as well as examples of calculating the Monthly Invoice, the actual Monthly payments by Buyer to Seller (where applicable) and the Seller's Monthly accruals, which will be aggregated and paid to Buyer at the end of the year (US$ 423,000 in this particular example).

—   Prepayment by Buyer for the recovered Monthly Make-Up Quantities will be calculated in the same manner as shown in Section IV above.

—   The example in Table 2 shows a case where the Buyer recovered only 78,100,000 Mscf during the 12 Month period. In accordance with Article 2.8 (c), Seller shall forthwith pay to Buyer for the unrecovered Monthly Make-Up Quantities less the waived quantities (that being 1,540,000), which shall be calculated as follows:

    100,000,000 − 78,100,000  =  21,900,000 Mscf
    21,900,000 −   1,540,000  =  20,360,000 Mscf

In this example, the Buyer shall pay to Seller the prepaid amount for this quantity of Gas of 20,360,000 Mscf calculated in the same manner as shown in Section IV above.

Table 1

| Month | MMQ, Bscf | actual Gas offtake by Buyer, Bscf | quantity paid for by Buyer, Bscf | Carry Forward Quantities, Bscf | balance unused Carry-Forward Quantities, Bscf | Reduced MMQ, Bscf | Monthly Make-Up Quantities, Bscf | balance unrecovered Monthly Make-Up Quantities, Bscf |
|---|---|---|---|---|---|---|---|---|
| "n" | "A" | "B" | "C" | "D" | "E" | "G" | "H" | "I" |
| January | 5.05 | 4.00 | 5.05 | 0.00 | 0.00 | 5.05 | 1.05 | 1.05 |
| February | 4.95 | 9.00 | 7.96 | 3.01 | 3.01 | 4.95 | 0.00 | 0.00 |
| March | 6.02 | 4.00 | 4.00 | 0.00 | 0.99 | 4.00 | 0.00 | 0.00 |
| April | 6.02 | 1.00 | 5.03 | 0.00 | 0.00 | 5.03 | 4.03 | 4.03 |
| May | 8.03 | 9.00 | 8.03 | 0.00 | 0.00 | 8.03 | 0.00 | 3.06 |
| June | 8.03 | 9.00 | 8.03 | 0.00 | 0.00 | 8.03 | 0.00 | 2.09 |
| July | 8.03 | 9.00 | 8.03 | 0.00 | 0.00 | 8.03 | 0.00 | 1.12 |
| August | 8.03 | 9.00 | 8.03 | 0.00 | 0.00 | 8.03 | 0.00 | 0.15 |
| September | 8.03 | 9.00 | 8.85 | 0.82 | 0.82 | 8.03 | 0.00 | 0.00 |
| October | 8.03 | 9.00 | 9.00 | 0.97 | 1.79 | 8.03 | 0.00 | 0.00 |
| November | 6.02 | 10.00 | 10.00 | 3.98 | 5.77 | 6.02 | 0.00 | 0.00 |
| December | 5.05 | 2.00 | 2.00 | 0.00 | 0.00 | 2.00 | 0.00 | 0.00 |
| Year Totals | 81.28 | 84.00 | 84.00 | | | | | |
| | | | | | | | | |
| January | 5.05 | 1.00 | 5.05 | 0.00 | 0.00 | 5.05 | 4.05 | 4.05 |
| February | 4.95 | 4.00 | 4.95 | 0.00 | 0.00 | 4.95 | 0.95 | 4.99 |
| March | 6.02 | 7.00 | 6.02 | 0.00 | 0.00 | 6.02 | 0.00 | 4.01 |
| April | 6.02 | 6.00 | 6.02 | 0.00 | 0.00 | 6.02 | 0.02 | 4.03 |
| May | 8.03 | 7.00 | 8.03 | 0.00 | 0.00 | 8.03 | 1.03 | 5.06 |
| June | 8.03 | 7.00 | 8.03 | 0.00 | 0.00 | 8.03 | 1.03 | 6.09 |
| July | 8.03 | 9.00 | 8.03 | 0.00 | 0.00 | 8.03 | 0.00 | 5.12 |
| August | 8.03 | 9.00 | 8.03 | 0.00 | 0.00 | 8.03 | 0.00 | 4.15 |
| September | 8.03 | 9.00 | 8.03 | 0.00 | 0.00 | 8.03 | 0.00 | 3.18 |
| October | 8.03 | 8.00 | 8.03 | 0.00 | 0.00 | 8.03 | 0.03 | 3.21 |
| November | 6.02 | 7.00 | 6.02 | 0.00 | 0.00 | 6.02 | 0.00 | 2.23 |
| December | 5.05 | 5.00 | 5.05 | 0.00 | 0.00 | 5.05 | 0.05 | 2.28 |
| Year Totals | 81.28 | 79.00 | 81.28 | | | | | |
| | | | | | | | | |
| January | 5.05 | 6.00 | 5.72 | 0.67 | 0.67 | 5.05 | 0.00 | 0.00 |
| February | 4.95 | 4.00 | 4.28 | 0.00 | 0.00 | 4.28 | 0.28 | 0.28 |
| March | 6.02 | 7.00 | 6.72 | 0.70 | 0.70 | 6.02 | 0.00 | 0.00 |
| April | 6.02 | 6.00 | 6.00 | 0.00 | 0.68 | 6.00 | 0.00 | 0.00 |
| May | 8.03 | 7.00 | 7.38 | 0.00 | 0.00 | 7.38 | 0.35 | 0.35 |
| June | 8.03 | 7.00 | 8.03 | 0.00 | 0.00 | 8.03 | 1.03 | 1.38 |
| July | 8.03 | 9.00 | 8.03 | 0.00 | 0.00 | 8.03 | 0.00 | 0.41 |
| August | 8.03 | 9.00 | 8.59 | 0.56 | 0.56 | 8.03 | 0.00 | 0.00 |
| September | 8.03 | 9.00 | 9.00 | 0.97 | 1.53 | 8.03 | 0.00 | 0.00 |
| October | 8.03 | 8.00 | 8.00 | 0.00 | 1.50 | 8.00 | 0.00 | 0.00 |
| November | 6.02 | 7.00 | 7.00 | 0.98 | 2.48 | 6.02 | 0.00 | 0.00 |
| December | 5.05 | 5.00 | 5.00 | 0.00 | 0.00 | 5.00 | 0.00 | 0.00 |
| Year Totals | 81.28 | 86.00 | 83.72 | | | | | |

48

ANNEX 1
Table 2



| Month | MMQ, Bscf | actual Gas offtake by Buyer, Bscf | Properly Nominated Quantities, Bscf | Seller's ability to provide Gas | waived quantities, due to Buyer's inability to take, Bscf | Prevailing Contract Price, $/Mscf | Monthly Invoice, US$ | prepayments by Buyer for the recovered Monthly Make-Up Quantities, US$ | actual Monthly payments by Buyer to Seller, US$ | Seller's Monthly accruals (to be paid to Buyer at end of year), US$ |
|---|---|---|---|---|---|---|---|---|---|---|
| January | 6.02 | 6.00 | 6.02 | yes | 1.02 | | | | 100,000 | 0 |
| February | 6.02 | 5.50 | 6.02 | yes | 0.52 | | | | 0 | 140,000 |
| March | 6.02 | 6.20 | 6.02 | yes | 0.00 | | | | 0 | 38,000 |
| April | 6.02 | 6.40 | 6.02 | yes | 0.00 | | | | 256,000 | 0 |
| May | 8.03 | 7.00 | 8.03 | No | 0.00 | | | | 250,000 | 0 |
| June | 8.03 | 7.00 | 8.03 | No | 0.00 | | | | 420,000 | 0 |
| July | 8.03 | 7.00 | 8.03 | No | 0.00 | | | | 310,000 | 0 |
| August | 8.03 | 7.00 | 8.03 | No | 0.00 | | | | 380,000 | 0 |
| September | 8.03 | 7.00 | 8.03 | No | 0.00 | | | | 500,000 | 0 |
| October | 8.03 | 7.00 | 8.03 | No | 0.00 | | | | 0 | 150,000 |
| November | 6.02 | 6.50 | 6.02 | yes | 0.00 | | | | 340,000 | 0 |
| December | 6.02 | 6.50 | 6.02 | yes | 0.00 | | | | 0 | 95,000 |
| Year Totals | 84.30 | 78.10 | 84.30 | | 1.54 | | | | | 423,000 |

## ANNEX 2

### Procedures for Arbitration

1.  The Party commencing an arbitration (the *claimant*) shall serve a written notice of arbitration on the other Party (the *respondent*) stating:

    (a)   the names and addresses of the parties to the arbitration;

    (b)   a brief statement of the nature of the dispute(s), and the relief claimed;

    (c)   the full name and address of the arbitrator appointed by the claimant pursuant to paragraph 4 below; and

    (d)   claimant's proposed place(s) of arbitration.

2.  Within one hundred and twenty (120) days of receiving the claimant's notice of arbitration the respondent shall serve a written response containing:

    (a)   a confirmation or denial of all or part of the claimant's claim(s);

    (b)   a brief statement of the nature of any counterclaim(s);

    (c)   the full name and address of the arbitrator appointed by the respondent under paragraph 4 below; and

    (d)   agreement to the claimant's proposed location(s) of arbitration, or alternative place(s) acceptable to the respondent.

3.  The place of the arbitration shall be agreed upon by the Parties to the dispute after such dispute arises. The claimant initiating arbitration shall include in the notice of arbitration its proposed place(s), and the respondent shall respond with either its agreement to one of the place(s) proposed by claimant or initiate discussions concerning alternate place(s). In the event that such arbitration place(s) cannot be agreed upon by the claimant and respondent prior to the appointment of the third arbitrator, then the arbitral tribunal shall, as its first act, convene in Tehran, Iran, or an alternative location selected by the arbitrators, to decide upon the place(s) of the arbitration.

4.  The arbitral tribunal shall be composed of three arbitrators appointed as follows:

    (a)   each the Party shall appoint an arbitrator, and the two arbitrators so appointed shall appoint a third arbitrator who shall act as chairman of the tribunal whom shall be from a neutral country other than those of which the Parties are nationals;

(b)   if either Party fails to appoint an arbitrator, within forty (40) days of receiving notice of the appointment of an arbitrator by the other Party, such arbitrator shall at the request of that Party be appointed by the President of the International Chamber of Commerce (ICC), whom shall be from a neutral country other than those of which the Parties are nationals;

(c)   if the two arbitrators to be appointed by the Parties fail to agree upon a third arbitrator, within twenty (20) days of the appointment of the second arbitrator, the third arbitrator, shall be appointed by the President of the International Chamber of Commerce (ICC) at the written request of either Party, whom shall be from a neutral country other than those of which the Parties are nationals;

(d)   a prospective arbitrator shall disclose to the Parties any circumstances likely to give rise to justifiable doubts as to his impartiality or independence, a Party who intends to challenge an arbitrator shall send written notice of his challenge (with reasons for his challenge) to the other Party, the challenged arbitrator and the other members of the arbitral tribunal within thirty (30) days after the appointment of the challenged arbitrator has been notified to the challenging Party or within thirty (30) days after the circumstances giving rise to the challenge became known to that Party. If the challenge is not accepted by the arbitrator or the other Party, a decision on the challenge shall be made within forty (40) days by the International Chamber of Commerce (ICC).

(e)   should a vacancy arise because any arbitrator dies, resigns, fails to act, refuses to act, is successfully challenged, or becomes incapable of performing his functions, the vacancy shall be filled using the same method by which that arbitrator was originally appointed.   When a vacancy is filled the newly established tribunal shall in its discretion determine whether any prior hearing shall be repeated.

5.   No later than ninety (90) days after the tribunal has been established in accordance with paragraph 4 above, the claimant shall deliver to the respondent (with copies to each arbitrator) a written statement of his case, containing particulars of his claims and submissions in support thereof, together with copies of any documents relied upon.

6.   Within one hundred and twenty (120) days of the receipt of the claimant's statement of his case, the respondent shall deliver to the claimant (with copies to each arbitrator) a statement of defense, together with particulars of any counterclaim(s) and copies of any documents relied upon.

7.   Within ninety (90) days of the receipt by the claimant of any statement of counterclaim(s) by the respondent, the claimant may deliver to the respondent (with copies to each arbitrator) a reply to the counterclaim(s) together with copies of any additional documents relied upon.

8.  The following procedural rules inter alia shall in any event be taken as agreed:

    (a)  the language of the arbitration shall be English;

    (b)  the tribunal may in its discretion hold a hearing and make an award in relation to any preliminary issue at the request in writing of either Party and shall do so at the joint request in writing of both Parties;

    (c)  the tribunal shall hold a hearing(s), in order to determine substantive issues unless the Parties agree otherwise in writing;

    (d)  all hearings shall be held in private;

    (e)  the tribunal shall issue its final award within 60 (sixty) days of the last hearing of the substantive issues in dispute between the Parties, unless the Parties otherwise agree in writing;

    (f)  any award or procedural decision of the tribunal shall be made by a majority of the arbitrators;

    (g)  the award shall be made in writing and shall be final and binding on the Parties;

    (h)  the award shall state the reasons on which the award is based, unless the Parties agree in writing that no reasons are to be given;

    (i)  each Party shall be responsible for his own costs of litigation. The costs of arbitration shall be equally born by both Parties, unless the arbitral tribunal otherwise decides.

9.  The Parties shall decide on other procedural rules of arbitration, whenever and whatever it deems necessary, by mutual agreement. However, in case of disagreement or gap in such procedural rules of arbitration, the procedural rules of arbitration of the International Chamber of Commerce (ICC) shall apply. Nevertheless, it will not be explicitly or implicitly interpreted as submission to International Chamber of Commerce's authority.

10.  Referral of matters in dispute to arbitration by a Party initiating arbitration shall, if necessary, be subject to the obtaining of the approval of the appropriate authority of the initiating Party.

*In the Name Of God*

*Strictly Confidential*

*Side Letter to*
**Gas Sales and Purchase Contract ("Contract")**
**Between**
**National Iranian Oil Company ("Seller")**
**And**
**Crescent Petroleum Company International Limited ("Buyer")**

It is understood and agreed that this Side Letter (herein referred to as "Side Letter") entered into on even date with the Contract between National Iran ian Oil Company and Crescent Petroleum Company International Limited sh all be considered as an integral part of the Contract. Where applicable terms used in this Side Letter shall have the same meaning as defined and used in the Contract; otherwise new terms shall be as defined in this Side Letter. Accordingly, Buyer and Seller have agreed as follows:

### A.    Increase to DCQ

Upon written notification from Buyer (such notification to be within six months from the date the Seller notifies Buyer in writing pursuant to Section B below that all the relevant Iranian authorities have approved the Contract) the Parties agree that the DCQ be increased from 330 MMScf/Day to any quantity up to 600 MMScf/Day. The increased DCQ and all other related Gas quantities in the Contract (except for the quantities of Gas up to the start of the fifth Month of the Second Delivery Year) such as ACQ and MMQ shall be modified accordingly and proportionately. For instance, in the event the DCQ is increased to 600 MMscf/Day, the ACQ for a Delivery Year (other than the second Delivery Year which shall be adjusted accordingly) shall be 219 Bscf and the MMQ for a Delivery Year (other than for the first four months of the second Delivery Year) shall be as follows:

| | |
|---|---|
| January to April | 10.95 Bscf/Month |
| May to October | 14.60 Bscf/Month |
| November to December | 10.95 Bscf/Month |

All other terms and conditions of the Contract shall remain unchanged.

### B.    Circumstances for Nullification of Contract

Seller undertakes to obtain necessary approvals of the relevant Iranian authorities within three months from the Effective Date, and notify Buyer to this effect, failing which either Party shall have the right to withdraw from the Contract and, upon such withdrawal, the Contract shall become null and void and neither Party shall have any obligation to the other Party in such event under the terms of the Contract except obligations arising from Article 15 which shall subsist.



Buyer undertakes to secure the end-user gas market for the quantity of Gas to be taken under the Contract in the United Arab Emirates (as Buyer is entitled to sell the Gas only in the United Arab Emirates) within six months from the date the Seller notifies Buyer in writing that all the relevant Iranian authorities have approved the Contract, and notify Seller to this effect, failing which either Party shall have the right to withdraw from the Contract and upon such withdrawal, the Contract shall become null and void and neither Party shall have any obligation to the other Party in such event under the terms of the Contract except obligations arising from Article 15 which shall subsist.

### C.    Buyer's Obligations

In the event that Buyer fails to secure the end-user Gas market (as set out in Section B above) for reasons attributable to itself within 6 months from the date Seller notifies Buyer in writing that all the relevant Iranian authorities have approved the Contract, neither Buyer nor any of its affiliates nor any entities in which the current shareholders may have any controlling stake nor any of the current shareholders and directors shall enter into any contract in any form to import gas for sale into the United Arab Emirates within five years from the Effective Date. This will not apply to existing contracts valid at the Effective Date.

### D.    Operation Agreement

The Parties undertake to execute an Operation Agreement (as envisaged in the Contract) as soon as possible after the Effective Date. Failure to execute such an Operation Agreement shall not relieve either Party of its obligations under the Contract.

Ahmad Rahgozar
Vice President
National Iranian Oil Company

Hamid D. Jafar
Chairman and Chief Executive
Officer, Crescent Petroleum
Company International Limited

54

*In the Name Of God*

*Strictly Confidential*

*Second Side Letter to*
*Gas Sales and Purchase Contract ("Contract")*
*Between*
*National Iranian Oil Company*
*And*
*Crescent Petroleum Company International Limited*

It is understood and agreed that this Second Side Letter (hereinafter referred to as "**Second Side Letter**") entered into on even date with the Contract between National Iranian Oil Company and Crescent Petroleum Company International Limited shall be considered an integral part of the Contract. Where applicable terms used in this Second Side Letter shall have the same meaning as defined and used in the Contract; otherwise new terms shall be as defined in this Second Side Letter. Accordingly, the Parties have agreed as follows:

Buyer undertakes that it shall provide for the initial 10 Delivery Years a confidential security arrangement (through the banking system) that allows Seller, in the event of payment default or failing to take any gas (in accordance with the terms and conditions of the Contract) by Buyer, access to the revenues derived from Buyer's gas sales agreement with Dubai Supply Authority to recover Seller's pipeline investment. The required mechanism for this security arrangement shall be to the reasonable satisfaction of Seller and agreed by the Parties within 6 months from the date the Seller notifies Buyer in writing that all the relevant Iranian authorities have approved the Contract, failing which either Party shall have the right to withdraw from the Contract and, upon such withdrawal, the Contract shall become null and void and neither Party shall have any obligation to the other Party in such event under the terms of the Contract except obligations arising from Article 15 which shall subsist.

All other terms and conditions of the Contract shall remain unchanged.

Ahmad Rahgozar
Vice President
National Iranian Oil Company

Hamid D. Jafar
Chairman & Chief Executive Officer, Crescent Petroleum Company International Limited

*In the Name Of God*

*Strictly Confidential*

**Third Side Letter to**
**Gas Sales and Purchase Contract ("Contract")**
**Between**
**National Iranian Oil Company**
**And**
**Crescent Petroleum Company International Limited**

It is understood and agreed that this Third Side Letter (hereinafter referred to as "**Third Side Letter**") entered into on even date with the Contract between National Iranian Oil Company and Crescent Petroleum Company International Limited shall be considered an integral part of the Contract. Where applicable terms used in this Third Side Letter shall have the same meaning as defined and used in the Contract; otherwise new terms shall be as defined in this Third Side Letter. Accordingly, the Parties have agreed as follows:

Seller acknowledges that Buyer is selling Gas for consumption in the United Arab Emirates and that sale of any gas by Seller to any other party for use in the United Arab Emirates on terms more advantageous than those contained in this Contract, would be damaging to the commercial interests of Buyer. Seller therefore agrees that prior to selling or providing any gas destined for the United Arab Emirates (other than associated gas from the Sirri fields) to any other party it shall first offer such gas to Buyer upon commercial terms at least as favourable (having regard to price and taking into account all relevant factors such as delivery point and gas quality specifications) as those upon which Seller is prepared to contract with such other party.

All other terms and conditions of the Contract shall remain unchanged.

Ahmad Rahgozar
Vice President
National Iranian Oil Company

Hamid D. Jafar
Chairman & Chief Executive
Officer, Crescent Petroleum
Company International Limited

C-6

*In the Name Of God*

<u>*Strictly Confidential*</u>

*Fourth Side Letter to*
*Gas Sales and Purchase Contract ("Contract")*
*Between*
*National Iranian Oil Company*
*And*
**Crescent Petroleum Company International Limited**

It is understood and agreed that this Fourth Side Letter (hereinafter referred to as "Fourth Side Letter") entered into on even date with the Contract between National Iranian Oil Company and Crescent Petroleum Company International Limited shall be considered an integral part of the Contract. Where applicable terms used in this Fourth Side Letter shall have the same meaning as defined and used in the Contract; otherwise new terms shall be as defined in this Fourth Side Letter. Accordingly, the Parties have agreed as follows:

Upon written notification from Buyer (or its affiliates) the Parties shall use their best endeavours to obtain the necessary approvals so that Buyer may proceed to build, and operate a gas processing plant, at Buyer's sole cost, expense and benefit, at an enroute onshore location in Iranian territory. In the event that Buyer (or its affiliates) notifies Seller of its intent to build such processing plant, the commercial terms of the Contract shall remain unchanged and Seller shall assist Buyer (or its affiliates) in finding and leasing a suitable site and obtaining all necessary approvals, licences and consents from the relevant governmental authorities for such processing plant. Buyer undertakes to bear any incremental transportation costs which Seller may incur in transporting the Gas to and from the processing plant.

All other terms and conditions of the Contract shall remain unchanged.

Ahmad Rahgozar
Vice President
National Iranian Oil Company

Hamid D. Jafar
Chairman & Chief Executive
Officer, Crescent Petroleum
Company International Limited

57

FIRST AMENDMENT

TO

GAS SALES AND PURCHASE CONTRACT

BETWEEN

NATIONAL IRANIAN OIL COMPANY (N.I.O.C.)

AND

CRESCENT PETROLEUM COMPANY INTERNATIONAL LIMITED

Dated: 25th April, 2001

*In the Name of God*

This Amendment to the Gas Sales and Purchase Contract dated 25th April 2001 is made this 25th April 2001 between:

National Iranian Oil Company (NIOC), a company incorporated and existing under the laws of the Islamic Republic of Iran, whose Head Office is situated at Taleghani Avenue, Tehran, I.R. of Iran (hereinafter referred to as "Seller"), of the one part

And

Crescent Petroleum Company International Limited (Crescent), a corporation incorporated and existing under the laws of Bermuda, whose Head Office is situated at Crescent Tower, Al Buhaira Corniche, Sharjah, United Arab Emirates, (hereinafter referred to as "Buyer"), of the other part.

WHEREAS:

-    Seller and Buyer entered into a Gas Sale and Purchase Contract ("Contract") on 25th April 2001, and
-    The Parties desire to amend the Contract pursuant to Article 19 of the Contract.

Now, therefore, the Parties hereby agree as follows:

1. All terms used herein, as have been defined in the Contract, shall have the meanings set out in the Contract.

2. Buyer undertakes and agrees that Gas taken from the Seller under the Contract shall solely be consumed in the territory of the United Arab Emirates.

3. Seller agrees that adequacy of gas reserves for the provision of Gas pursuant to the Contract or any circumstances affecting the ability of the gas reserves to supply such Gas shall not be considered an event of Force Majeure.

4. All other terms and conditions of the Contract shall continue and subsist subject to the amendment made herein.

In witness whereof, this Amendment has been duly executed by the Parties hereto as of the date first written above.

Ahmad Rahgozar
Vice President
National Iranian Oil Company

Hamid D. Jafar
Chairman and Chief Executive
Officer, Crescent Petroleum
Company International Limited

C-8

# SECOND AMENDMENT

## TO

## GAS SALES & PURCHASE AGREEMENT

### BETWEEN

### NATIONAL IRANIAN OIL COMPANY
### (N.I.O.C.)

### AND

### CRESCENT PETROLEUM COMPANY INTERNATIONAL LIMITED

### In The Name of God

This Second Amendment to the Gas Sales & Purchase Contract is made this 17th day of March 2003 between:

National Iranian Oil Company (NIOC), a company incorporated and existing under the laws of the Islamic Republic of Iran, whose Head Office is situated at Taleghani Avenue, Tehran, I.R. of Iran (hereinafter referred to as "Seller"), of the one part

And

Crescent Petroleum Company International Limited (Crescent), a Corporation incorporated and existing under the laws of Bermuda, whose Head Office is situated at Crescent Tower, Al Buhaira Corniche, Sharjah, United Arab Emirates, (hereinafter referred to as "Buyer"), of the other part.

WHEREAS:

- Seller and Buyer entered into a Gas Sales & Purchase Contract as amended by the First Amendment on 25th April 2001 ("Contract"), and

- The Parties desire to amend the Contract pursuant to Article 19 of the Contract.

Now, Therefore, the Parties hereby agree as follows:

1. All terms used herein, as have been defined in the Contract, shall save as expressly amended herein, have the meanings set out in the Contract.

2. Article 3.1(d) of the Contract shall be replaced with the following new sub-Article (d) : "Maximum water content of 3.2 kgs/MMscf".

3. The Commencement Date stipulated in Articles 5.1 and 5.3 shall be amended to 1st August 2005.

4. Article 2.3 of the Contract shall be replaced by the following new Article:

   "Seller undertakes and guarantees to make available for delivery and sale to Buyer, during the term of the Contract a daily quantity of Gas (herein referred to as "Daily Contract Quantities" or "DCQ") of 500 MMscf/Day except during:

   (i)   the first Delivery Year and the first 4 months of the second Delivery Year when the DCQ shall be 198 MMscf/Day;

   (ii)  the latter 8 months of the second Delivery Year and the subsequent third Delivery Year when the DCQ shall be 330 MMscf/Day;

(iii)   the fourth Delivery Year when the DCQ shall be 350 MMscf/Day;

(iv)   the fifth Delivery Year when the DCQ shall be 400 MMscf/Day; and

(v)   the sixth Delivery Year when the DCQ shall be 450 MMscf/Day.

Notwithstanding the foregoing the DCQ may be increased pursuant to Clause 7 hereof."

5.   Article 2.4 of the Contract shall be replaced by the following new Article:

"Seller undertakes and guarantees to make available for delivery and sale to Buyer, during the term of the Contract, an annual quantity of Gas (herein referred to as "**Annual Contract Quantities**" or "**ACQ**") of 182.5 Bscf/Year except during:

(i)   the first Delivery Year when the ACQ shall be 72.27 Bscf/Year;

(ii)   the second Delivery Year when the ACQ shall be 104.4 Bscf/Year (this quantity is determined at the rate of 6.02 Bscf/Month for April to July of the second Delivery Year and at 10.04 Bscf/Month for the remaining 8 Months of the second Delivery Year);

(iii)   the third Delivery Year when the ACQ shall be 120.45 Bscf/Year;

(iv)   the fourth Delivery Year when the ACQ shall be 127.75 Bscf/Year;

(v)   the fifth Delivery Year when the ACQ shall be 146 Bscf/Year; and

(vi)   the sixth Delivery Year when the ACQ shall be 164.25 Bscf/Year."

6.   Article 2.5 (a) of the Contract shall be replaced by the following new Article:

"(a)   During the Months of:

| | |
|---|---|
| January to April | 9.12 Bscf/Month |
| May to October | 12.16 Bscf/Month |
| November to December | 9.12 Bscf/Month |

Except:

(i)   during the first Delivery Year and the first 4 Months of the second Delivery Year when the MMQ shall be 39.6% of the quantities referred in this Article 2.5(a);

     (ii)     the latter 8 Months of the second Delivery Year and the third Delivery Years when the MMQ shall be 66% of the quantities referred in this Article 2.5(a);

     (iii)    during the fourth Delivery Year when the MMQ shall be 70% of the quantities referred in this Article 2.5(a);

     (iv)    during the fifth Delivery Year when the MMQ shall be 80% of the quantities referred in this Article 2.5(a); and

     (v)     during the sixth Delivery Year when the MMQ shall be 90% of the quantities referred in this Article 2.5(a)."

7.    During the period from the second Delivery Year through to and including the sixth Delivery Year, Buyer (upon six months' written notice) may elect to increase the DCQ, as referred to in Article 2.3(ii), from 330 MMscf/Day to any quantity up to 500 MMscf/Day, on the same terms and conditions of the Contract; whereupon the related quantities in respect of ACQ and resultant MMQ, as referred to in Articles 2.4 and 2.5, respectively and (to the extent applicable) the quantities in Article 5.4, shall be amended proportionately.

8.    Buyer shall have the option (subject to the availability of Gas) to further increase the DCQ under the existing terms and conditions of the Contract beyond 500 MMscf/Day, up to the ultimate allowable capacity of the Pipeline and associated facilities. In the event Buyer wishes to further increase the DCQ beyond the ultimate allowable capacity of the Pipeline and associated facilities; such increased DCQ shall be made available upon separate terms and conditions to be agreed by the Parties; provided that Gas is available. In the event that the DCQ is increased pursuant to the terms of this Clause 8, then the actual date for the commencement of delivery of such incremental Gas shall be reasonably agreed upon by the Parties.

9.    The Parties undertake to execute an Operation Agreement (including a scope of work for interfaces between the Parties) as soon as possible but in any event not later than three months from the date of this Second Amendment. Failure to execute such Operation Agreement shall not relieve either Party of its obligations under the Contract.

10.    All other terms and conditions of the Contract shall remain valid and continue to subsist, save insofar as this Second Amendment expressly or impliedly amends them. In the event of any inconsistency between the terms and conditions of the Contract and the terms and conditions of this Second Amendment, the terms and conditions of this Second Amendment shall prevail.

11.    Buyer and Seller respectively warrant to each other that it is not necessary that any approval, consent or ratification be obtained in respect of this Second

Amendment in order to render it legal, valid and enforceable in accordance with its items.
In witness whereof, this Second Amendment has been duly executed by the parties hereto as of the date first above written.

Signed for and on behalf of                    Signed for and on behalf of
NIOC and by it duly authorized              Crescent and by it duly authorized


M. Mirmoezi                                          Ahsan Ullah Khan
Deputy Oil Minister &                                  Director
President of N.I.O.C                          Crescent Petroleum  Company
                                               International Limited

<u>Strictly Confidential</u>

*In the Name of God*

***Fifth Side Letter to***
***Gas Sales and Purchase Contract ("Contract")***
***Between***
***National Iranian Oil Company***
***And***
***Crescent Petroleum Company International Limited***

It is understood and agreed that this Fifth Side Letter (hereinafter referred to as "Fifth Side Letter") entered into on this 17th day of March 2003 between National Iranian Oil Company and Crescent Petroleum Company International Limited shall be considered as an integral part of the Contract signed on 25th April 2001.

Where applicable, terms used in this Fifth Side Letter shall have the same meaning as defined and used in the Contract; otherwise new terms shall be used as defined in this Fifth Side Letter. Accordingly, the Parties have agreed as follows:

A.   Buyer undertakes that it shall provide an irrevocable Letter of Credit or equivalent Bank Guarantee acceptable to Seller ("LC/BG") totalling USD 40,000,000 (forty million) in favour of Seller in respect of Buyer's payment obligations as they fall due under the Contract.  Seller's Monthly Invoices to be paid under the LC/BG shall be in an amount not exceeding USD 8,000,000 (eight million) in any one month.  The text and content of the LC/BG shall be to the reasonable satisfaction of Seller.  Each draw down under the LC/BG shall be made on a monthly basis until the entire amount of LC/BG is fully utilized.  The first draw down under the LC/BG shall not occur prior to the Commencement Date, and the LC/BG shall expire two years from the first Monthly Invoice paid by the bank.

B.   The Buyer shall arrange a letter of undertaking from Sharjah Electricity and Water Authority (SEWA) to the Seller acknowledging that SEWA:

   1.   is fully aware of the Contract between NIOC and Crescent;

   2.   has entered into a long term gas sales and purchase agreement with the Buyer, disclosing essential particulars of the agreement other than price;

   3.   declaring that it has undertaken to purchase minimum of USD 15,000,000 (fifteen million) worth of gas per annum for a minimum period of ten years;

   4.   in the event that Crescent fails to fulfill its contractual obligations (in accordance with the terms and conditions of the Contract) then SEWA



Undertakes to pay to NIOC nominated bank. account value of the gas delivered to SEWA.

C. The confirmation from the Buyer's bank to the seller in respect of the LC/BG as referred to in (A) above, and the letter of undertaking from SEWA as referred to in (B) above, shall be submitted to Seller within 6 months from the date of this Fifth Side Letter, failing which the Seller shall have the right to withdraw from the Contract and , upon such withdrawal, the Contract shall become null and void.

D. This Fifth Side Letter will supersede the First and Second Side Letters with immediate effects.
All other terms and conditions if the Contract shall remain unchanged.

Signed for and on behalf of
NIOC and by it duly authorized

Signed for and on behalf of
Crescent and by it duly authorized


M. Mirmoezi
Deputy Oil Minister &
President of N.I.O.C

Ahsan Ullah Khan
Director
Crescent Petroleum Company
International Limited



75

*In the Name of God*

Strictly Confidential

### Sixth Side Letter to
### Gas Sales and Purchase Contract ("GSPC")
### Between
### National Iranian Oil Company
### And
### Crescent Petroleum Company International Limited

7th July 2004

It is understood and agreed that this Sixth Side Letter (hereinafter referred to as "Sixth Side Letter") entered into on this 20th day of May 2004 between National Iranian Oil Company and Crescent Petroleum Company International Limited shall be considered an integral part of the Gas Sales & Purchase Contract ("GSPC") signed on 25th April 2001.

Where applicable, terms used in this Sixth Side Letter shall have the same meaning as defined and used in the GSPC; otherwise new terms shall be as defined in this Sixth Side Letter.

### *Accordingly, the Parties have agreed as follows:*

A. NIOC, on behalf of itself and its affiliates, hereby grants Crescent exclusivity for the transportation and sales of Iranian gas destined into the Emirate of Sharjah, and shall not sell gas to any other party destined into Sharjah, throughout the subsistence of the GSPC.

B. The Parties agree that the GSPC is in good standing and valid.

C. The "Letter of Credit" and so called "Sewa Letter" shall be, re-issued to reflect the revised dates stipulated in this Sixth Side Letter, and the "Letter of Credit" amended to delete Item B(III), and submitted to NIOC within two months from the date of this Sixth Side Letter. Upon receipt of these documents referred to above, NIOC and Crescent shall forthwith finalize and sign the relevant Operation Agreement, and NIOC shall communicate its consent with regard to assignment of "GSPC" to Crescent Gas Corporation Limited ("CGC"). NIOC may also assign GSPC to one of its affiliates without prior consent of Crescent, subject to NIOC executing a guarantee of the obligations of the assignee in accordance with Article 16.2 of the GSPC.

In addition to the parties right under the GSPC,

D. Either Party may, at any time from the commencement of GSPC gas deliveries, request a revision of the GSPC Contract Price formula(e), if:

(a) any sales and purchase contract is concluded by NIOC or any company from any exporting country for gas deliveries to the UAE; and

(b) such sales and purchase contract (or contracts) relates to sales of gas quantities collectively greater than 60% of the annual contract quantities under the GSPC; and

- 1 -

(c) such sales and purchase contract contain a price formula(e) which is different from the GSPC Contract Price formula(e); and

(d) gas deliveries pursuant to (a) to (c) above have commenced.

In making such request, the requesting Party shall provide details to substantiate and justify such GSPC Contract Price formula(e) revision by reference to the contract or contracts referred to in (a) to (c) above and the price contained therein (if there is more than one such contract then the weighted average of the prices shall apply). The Parties shall use their best endeavours to reach agreement on a revision of the GSPC Contract Price formula(e) within a period of 15 days from the date of serving the said request, failing which the requesting Party may refer the matter to arbitration under Article 22 of the GSPC. In making their determination, the arbitrators shall consider all relevant factors. Until a mutually acceptable agreement on any revision of the GSPC Contract Price formula(e) has been reached between the Parties, or until an arbitral award has been issued, the existing GSPC Contract Price formula(e) shall remain in force.

The arbitral award, if any, shall stipulate revised GSPC Contract Price formula(e) which shall take effect six months after the date of such award. The Party against whom the award has been made shall defer payment/repayment of the difference resulting from any such revised GSPC Contract Price formula(e) until the end of the seventh Contract Year, whereupon such deferred sums shall be payable/repayable from the eighth Contract Year within a maximum period of 3 years. Interest shall be applied to the outstanding balance of any deferred payment amount at the rate of LIBOR + 2%.

E. This Sixth Side Letter shall supersede the Third Side Letter, which Third Side Letter shall be considered as null and void with immediate effect. Therefore Crescent hereby waives its rights of refusal embodied in the Third Side Letter.

F. The Commencement Date of August 1, 2005 in Amendment No.2 to the GSPC shall be amended to December 1, 2005.

G. All other terms and conditions of the GSPC and subsequent addenda and amendments shall remain unchanged.

H. All approvals on the part of each Party necessary to render this Sixth Side Letter valid and enforceable have been obtained.

M. Mirmoezi
Managing Director 07.July 2004
**National Iranian Oil Company**

Hamid D. Jafar
Chairman & CEO
**Crescent Petroleum Company International Limited**

-2-

77